James E. Magleby (7247)
magleby@mcg.law
Jennifer Fraser Parrish (11207)
parrish@mcg.law
**MAGLEBY CATAXINOS & GREENWOOD, PC**
141 West Pierpont Avenue
Salt Lake City, Utah 84101
Tel.: (801) 359-9000
Fax: (801) 359-9011

Andrew W. Ferich*
aferich@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Tel.: 310.474.9111
Fax: 310.474.8585

Anthony L. Parkhill*
aparkhill@barnowlaw.com
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Ste. 1630
Chicago, IL 60606
Tel.: 312.621.2000
Fax: 312.641.5504

Attorneys for Plaintiff Celeste Allen
and the Proposed Class
**pro hac vice forthcoming*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

| | |
|---|---|
| **CELESTE ALLEN, individually and on behalf of all others similarly situated,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ACADEMY MORTGAGE CORPORATION,**<br><br>**Defendant.** | **PROPOSED CLASS ACTION**<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**Case No. 2:24-cv-67** |

## CLASS ACTION COMPLAINT

Plaintiff Celeste Allen ("Plaintiff"), individually and on behalf of all others similarly situated (collectively, "Class members"), by and through her attorneys, brings this Class Action

Complaint against Defendant Academy Mortgage Corporation ("Academy" or "Defendant") and complains and alleges upon personal knowledge as to herself and information and belief as to all other matters.

## INTRODUCTION

1. Plaintiff brings this class action against Academy for its failure to secure and safeguard her and approximately 284,443 other individuals' personally identifiable information, including first and last names, dates of birth, and Social Security numbers ("PII").

2. Defendant Academy is an independent mortgage lender based in Draper, Utah. Academy offers a wide range of consumer mortgage options, including conventional loans, FHA loans, VA loans, USDA loans, jumbo loans, Renovation loans, and other refinancing options.

3. Academy reported that, on or about March 21, 2023, it discovered a network security incident in which "an unauthorized third party accessed and disabled some of [its] systems," and responded by launching an internal investigation into the suspicious activity.[1] Academy's investigation revealed that one or more unauthorized individuals gained access to Academy's network systems and accessed certain files containing the sensitive personal information of Academy's current and former customers and employees (the "Data Breach").

4. Academy provided limited details about the Data Breach, including whether or not the cybercriminal(s) responsible for breach were identified or whether the information exfiltrated was held for ransom. Academy also did not disclose whether its investigation detected the compromised information on the dark web. Instead, Academy stated that it "wiped and rebuilt affected systems and [has] taken steps to bolster [its] network security." Academy also offered

---

[1] Academy Mortgage Corporation, *Notice of Data Security Incident*, OFFICE OF THE MAINE ATTORNEY GENERAL, https://apps.web.maine.gov/online/aeviewer/ME/40/203fc6cf-82c9-4d8e-b280-501bb49c6602.shtml (last accessed Jan. 25, 2024).

access to Single Bureau Credit Monitoring/Single Bureau Credit Report/Single Bureau Credit Score services at no charge to affected individuals but, as Plaintiff's allegations will make clear, this offer is woefully inadequate.

5. Despite learning of the Data Breach as early as March 21, 2023, Academy did not announce the Data Breach publicly until nine months later, on or around December 20, 2023 and did not begin sending out Data Breach notification letters to affected individuals until around that time.

6. Academy's Notice did not disclose how it discovered the encrypted files on its computer systems were impacted, the means and mechanism of the cyberattack, the reason for the delay in notifying Plaintiff and the Class of the Data Breach, how Academy determined that the PII had been "accessed" by an unauthorized party, and, importantly, what specific steps Academy took following the Data Breach to secure its systems and prevent future cyberattacks.

7. The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect PII from the foreseeable threat of a cyberattack.

8. By being entrusted with Plaintiff's and Class members' PII for its own pecuniary benefit, Defendant assumed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard Plaintiff's and Class members' PII against unauthorized access and disclosure. Defendant also had a duty to adequately safeguard this PII under applicable law, as well as pursuant to industry standards and duties imposed by statutes, including Section 5 of the Federal Trade Commission Act ("FTC Act"). Defendant breached those duties by, among other things, failing to implement and maintain

reasonable security procedures and practices to protect the PII in its possession from unauthorized access and disclosure.

9. As a result of Defendant's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiff and approximately 284,443 Class members suffered injury and ascertainable losses in the form of out-of-pocket expenses, loss of value of their time reasonably incurred to remedy or mitigate the effects of the attack, the diminution in value of their personal information from their exposure, and the present and imminent thread of fraud and identity theft. This action seeks to remedy these failings and their consequences.

10. The injury to Plaintiff and Class members was compounded by the fact that Defendant did not notify those affected that their PII was subject to unauthorized access and exfiltration until December, 2023, approximately nine months after the Data Breach was discovered. Defendant's failure to timely notify the victims of their Data Breach meant that Plaintiff and Class members were unable to immediately take affirmative measures to prevent or mitigate the resulting harm.

11. Despite having been accessed and exfiltrated by unauthorized criminal actors, Plaintiff's and Class members' sensitive and confidential PII remains in the possession of Defendant. Absent additional safeguards and independent review and oversight, the information remains vulnerable to further cyberattacks and theft.

12. Defendant disregarded the rights of Plaintiff and Class members by, *inter alia*, failing to take adequate and reasonable measures to ensure their data systems were protected against unauthorized intrusions; failing to disclose that they did not have adequately robust computer systems and security practices to safeguard PII; failing to take standard and reasonably available steps to prevent the Data Breach; failing to properly train its staff and employees on

proper security measures; and failing to provide Plaintiff and Class members prompt and adequate notice of the Data Breach.

13. In addition, Defendant failed to properly monitor the computer network and systems that housed the PII. Had Defendant properly monitored these electronic systems, it would have discovered the intrusion sooner or prevented it altogether.

14. The security of Plaintiff's and Class members' identities is now at risk because of Defendant's wrongful conduct, as the PII that Defendant collected and maintained is now in the hands of data thieves. This present risk will continue for the course of their lives.

15. Armed with the PII accessed in the Data Breach, data thieves can commit a wide range of crimes including, for example, opening new financial accounts in Class members' names, taking out loans in their names, using their identities to obtain government benefits, filing fraudulent tax returns using their information, obtaining driver's licenses in Class members' names, and giving false information to police during an arrest.

16. As a result of the Data Breach, Plaintiff and Class members have been exposed to a present and imminent risk of fraud and identity theft. Among other measures, Plaintiff and Class members must now and in the future closely monitor their financial accounts to guard against identity theft. Further, Plaintiff and Class members will incur out-of-pocket costs to purchase adequate credit monitoring and identity theft protection and insurance services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

17. Plaintiff and Class members will also be forced to expend additional time to review credit reports and monitor their financial accounts for fraud or identity theft. And because the exposed information includes Social Security numbers and other immutable personal details, the risk of identity theft and fraud will persist throughout their lives.

18. Plaintiff brings this action on behalf of herself and all individuals in the United States whose PII was exposed as a result of the Data Breach Defendant learned of on or about March 21, 2023, and first publicly acknowledged on or about December 20, 2023. Plaintiff and Class members seek to hold Defendant responsible for the harms resulting from the massive and preventable disclosure of such sensitive and personal information. Plaintiff seeks to remedy the harms resulting from the Data Breach on behalf of herself and all similarly situated individuals whose Personal Information was accessed and exfiltrated during the Data Breach.

19. Plaintiff, on behalf of herself and all other Class members, brings claims for negligence, negligence per se, breach of implied contract, unjust enrichment, violations of the Washington Consumer Protection Act, and for declaratory and injunctive relief. To remedy these violations of law, Plaintiff and Class members thus seek actual damages, statutory damages, restitution, and injunctive and declaratory relief (including significant improvements to Defendant's data security protocols and employee training practices), reasonable attorneys' fees, costs, and expenses incurred in bringing this action, and all other remedies this Court deems just and proper.

## PARTIES

20. Plaintiff Celeste Allen is a Washington resident. She provided her PII to, or otherwise had her PII provided to, Academy in connection with transacting with or seeking lending services from Academy. She received a letter from Academy notifying her that she was affected by the Data Breach. Had Plaintiff known that Academy does not adequately protect PII, she would not have used Academy's services and agreed to provide Academy with her PII.

21. Defendant Academy Mortgage Corporation is incorporated in Utah, with its principal place of business at 339 West 13490 South, Draper, Utah 84020. Defendant can be served

through its registered agent, Corporation Service Company at 15 West South Temple, Suite 600 Salt Lake City, Utah 84101.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; there are more than 100 members in the proposed class; and Plaintiff and Defendant are citizens of different states.

23. This Court has personal jurisdiction over Defendant because Academy is a corporation organized under the laws of Utah and has its principal place of business at 339 West 13490 South, Draper, Utah 84020.

24. Venue is proper in this District because Academy maintains its headquarters and principal place of business in this District.

## FACTUAL ALLEGATIONS

### *Overview of Academy Mortgage Corporation*

25. Founded in 1988, Academy is an independent mortgage lender based in Draper, Utah. Academy offers a wide range of consumer mortgage options, including conventional loans, FHA loans, VA loans, USDA loans, jumbo loans, Renovation loans, and other refinancing options.[2]

26. In the regular course of its business, Academy collects and maintains the PII of customers, employees, and other persons who otherwise are affiliated or transacted with Academy for business purposes.

[2] *See* https://academymortgage.com/about (last accessed Jan. 25, 2024).

27. Academy requires customers and employees to provide their highly sensitive personally identifiable information to facilitate its mortgage services.[3] That information includes, but is not limited to, an individual's first and last name, address, e-mail address, phone number, Social Security number, credit scores and credit history, and financial information—such as income, assets, and liabilities, information about the individual's savings, investments, insurance, and business.[4] Academy stores this information digitally.

28. Academy's Privacy Policy ensures customers and other related persons that it is "committed to ensuring that your information is secure" and it "use[s] commercially reasonable efforts to protect your personal information collected, used, stored, shared, or transferred as part of [its] Services from access, loss, misuse, alteration, or destruction by any unauthorized party."[5]

29. By obtaining, collecting, using, and benefitting from Plaintiff's and Class member's PII, Defendant assumed legal and equitable duties that required Defendant to, at a minimum, implement adequate safeguards to prevent unauthorized use or disclosure of PII and to report any unauthorized use or disclosure of PII.

30. Plaintiff and Class members are, or were, customers or employees of Defendant, or otherwise are affiliated or transacted with Defendant and entrusted Defendant with their PII.

31. Plaintiff and Class members reasonably relied on Defendant to maintain the confidentiality and security of their PII and only to make required, authorized disclosures of this information, which Defendant ultimately failed to do. Compounding Defendant's breach of these duties, Defendant waited approximately nine months after discovering the Data Breach to notify those affected that their PII had been compromised.

---

[3] *See* https://academymortgage.com/privacy-policy (last accessed Jan. 25, 2024).
[4] *Id.*
[5] *Id.*

***The Data Breach***

32. On or about March 21, 2023, Academy discovered that an unauthorized third party, gained access to and disabled Academy's network systems. Academy has not revealed how long cybercriminals may have had access to its network.

33. Academy did not publicly announce the Data Breach until about December 20, 2023. The Notice letters that Academy sent to Plaintiff and the Class state that the information that was accessed included: "first and last name, date of birth, Social Security number."[6]

34. Academy's Notice omits pertinent information including how criminals gained access to the encrypted files on its systems, what computer systems were impacted, the means and mechanisms of the cyberattack, the reason for the delay in notifying Plaintiff and Class members of the Data Breach, how it determined that the PII had been accessed, and of particular importance to Plaintiff and Class members, what actual steps Academy took following the Data Breach to secure its systems and train its employees to prevent further cyberattacks.

35. Based on Academy's acknowledgment that "an unauthorized third party accessed and disabled some of [its] systems" and determined that certain "personal information during this incident," it is evident that unauthorized criminal actors did in fact access Academy's network and exfiltrate Plaintiff's and Class members' PII in an attack designed to acquire that sensitive, confidential, and valuable information.

36. The PII contained in the files accessed by cybercriminals appears not to have been encrypted because if properly encrypted, the attackers would have acquired unintelligible data and would not have accessed Plaintiff's and Class members' PII.

[6] *Notice of Data Security Incident*, *supra* note 1.

37. The Data Breach reportedly impacted the PII of approximately 284,443 individuals.[7]

***Academy Failed to Follow FTC Guidelines***

38. Defendant was also prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g.*, *FTC v. Wyndham Worldwide Corp*., 799 F.3d 236 (3d Cir. 2015).

39. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices.

40. According to the FTC, the need for data security should be factored into all business decision-making.

41. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses.

42. The guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

43. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is

[7] *Id.*

attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

44. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

45. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

46. Defendant failed to properly implement basic data security practices.

47. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to individuals' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

48. Defendant was at all times fully aware of its obligation to protect its customers' and employees' PII it was entrusted with. Defendant was also aware of the significant repercussions that would result from its failure to do so.

***Academy Failed to Comply with Industry Standards for Data Security***

49. Experts studying cyber security routinely identify corporations as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

50. Several best practices have been identified that at a minimum should be implemented by corporate entities like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

51. Other standard best cybersecurity practices include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

52. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

53. These foregoing frameworks are existing and applicable industry standards in the corporate industry and Defendant failed to comply with these accepted standards, thereby opening the door to cybercriminals and causing the Data Breach.

***Academy Owed Plaintiff and Class Members a Duty to Safeguard Their PII***

54. In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiff and Class members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in its possession from being compromised, lost,

stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Plaintiff and Class members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the PII of Class members.

55. Defendant owed a duty to Plaintiff and Class members to create and implement reasonable data security practices and procedures to protect the PII in its possession, including adequately training its employees and others who accessed PII within its computer systems on how to adequately protect PII.

56. Defendant owed a duty to Plaintiff and Class members to implement processes that would detect a compromise of PII in a timely manner.

57. Defendant owed a duty to Plaintiff and Class members to act upon data security warnings and alerts in a timely fashion.

58. Defendant owed a duty to Plaintiff and Class members to disclose in a timely and accurate manner when and how the Data Breach occurred.

59. Defendant owed a duty of care to Plaintiff and Class members because they were foreseeable and probable victims of any inadequate data security practices.

***Academy Knew that Criminals Target PII***

60. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in industries holding significant amounts of PII preceding the date of the breach.

61. At all relevant times, Defendant knew, or should have known, that Plaintiff's, and all other Class members' PII was a target for malicious actors. Despite such knowledge, Defendant failed to implement and maintain reasonable and appropriate data privacy and security measures

to protect Plaintiff's and Class members' PII from cyber-attacks that Defendant should have anticipated and guarded against.

62. The targeted attack was expressly designed to gain access to and exfiltrate private and confidential data, including (among other things) the PII belonging to Academy's customers and employees, like Plaintiff and Class members.

63. Personal Information is a valuable property right.[8] The value of PII as a commodity is measurable.[9] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[10] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[11] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

64. As a result of its real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, Social Security numbers, PII, and other sensitive information directly on various Internet websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

---

[8] *See* Marc van Lieshout, *The Value of Personal Data*, 457 IFIP Advances in Information and Communication Technology (May 2015), https://www.researchgate.net/publication/283668023 ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible...").

[9] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, Medscape (Apr. 28, 2014), http://www.medscape.com/viewarticle/824192.

[10] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD Digital Economy Papers, No. 220, p.4, OECD Publishing (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[11] *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, Interactive Advertising Bureau (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

65. Personal Information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[12] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[13] All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[14] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[15] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[16]

66. Criminals can use stolen PII to extort a financial payment by "leveraging details specific to a disease or terminal illness."[17] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . . By having healthcare information—specifically, regarding a sexually transmitted disease or

---

[12] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[13] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[14] Adam Greenberg, *Health insurance credentials fetch high prices in the online black market*, SC Magazine (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

[15] *In the Dark*, VPNOverview.com, accessible at https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed on Jan. 25, 2024).

[16] *See Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, FBI Cyber Division (Apr. 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[17] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HealthTech (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[18]

67. Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[19]

68. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

69. Indeed, cyberattacks have been common for over ten years with the Federal Bureau of Investigation ("FBI") warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII." The FBI further warned that that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[20]

70. Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to

---

[18] *Id.*

[19] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) Information Systems Research 254 (June 2011), https://www.jstor.org/stable/23015560?seq=1.

[20] Gordon M. Snow, *Statement before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit*, FBI (Sept. 14, 2011), https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector.

ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly.[21]

71. The Office for Civil Rights ("OCR") urges the use of encryption of data containing sensitive personal information. As long ago as 2014, the Department fined two healthcare companies approximately two million dollars for failing to encrypt laptops containing sensitive personal information. In announcing the fines, Susan McAndrew, OCR's deputy director of health information privacy, stated "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[22]

***Theft of PII Has Grave and Lasting Consequences for Victims***

72. Theft of PII is serious. The FTC warns consumers that identity thieves use PII to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[23]

73. Identity thieves use PII for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[24] According to Experian, one of the largest credit

---

[21] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[22] *Stolen Laptops Lead to Important HIPAA Settlements*, U.S. Department of Health and Human Services (Apr. 22, 2014), https://wayback.archive-it.org/3926/20170127085330/https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html.

[23] *See What to Know About Identity Theft*, Federal Trade Commission Consumer Advice, https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed on Jan. 25, 2024).

[24] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card number to withdraw funds, obtain a new driver's license or ID, and/or use the victim's information in the event of arrest or court action.[25]

74. With access to an individual's PII, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including: obtaining a driver's license or official identification card in the victim's name but with the thief's picture, using the victim's name and SSN to obtain government benefits, or filing a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's SSN, rent a house, or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[26]

75. Each year, identity theft causes billions of dollars of losses to victims in the United States. For example, with the PII stolen in the Data Breach, which includes Social Security numbers, identity thieves can open financial accounts, commit medical fraud, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of

[25] Susan Henson, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself?*, Experian (Sept. 1, 2017), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[26] *See Warning Signs of Identity Theft*, Federal Trade Commission, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last visited Nov. 15, 2022).

identity theft. These criminal activities have and will result in devastating financial and personal losses to Plaintiff and class members.

76. Personal Information is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it and trade the information on dark web black-markets for years.

77. For example, it is believed that certain highly sensitive personal information compromised in the 2017 Experian data breach was being used, three years later, by identity thieves to apply for COVID-19-related unemployment benefits.

78. The PII exposed in this Data Breach is valuable to identity thieves for use in the kinds of criminal activity described herein. These risks are both certainly impending and substantial. As the FTC has reported, if cyber thieves get access to a person's highly sensitive information, they will use it.[27]

79. For instance, with a stolen Social Security number, which is only one subset of the PII compromised in the Data Breach, someone can open financial accounts, get medical care, file fraudulent tax returns, commit crimes, and steal benefits.[28]

80. Identity thieves can use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social

---

[27] Ari Lazarus, *How fast will identity thieves use stolen info?*, Federal Trade Commission (May 24, 2017), https://www.consumer.ftc.gov/blog/2017/05/how-fast-will-identity-thieves-use-stolen-info.

[28] *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number* (Nov. 2, 2017), https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

81. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."

82. Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[29]

83. Theft of Social Security numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of her SSN, and a new SSN will not be provided until after the victim has suffered the harm.

84. Due to the highly sensitive nature of Social Security numbers, theft of Social Security numbers in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I

[29] *2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, their Families, Friends, and Workplaces*, Identity Theft Resource Center (2021), accessible at https://www.idtheftcenter.org/identity-theft-aftermath-study/.

have your name and your Social Security number and you haven't gotten a credit freeze yet, you're easy pickings."[30]

85. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that her or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

86. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[31]

87. It is within this context that Plaintiff and all other Class members must now live with the knowledge that their PII is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

88. A study by the Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:

---

[30] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (Aug. 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

[31] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 Journal of Systemics, Cybernetics and Informatics 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.




89. Victims of the Data Breach, like Plaintiff and Class members, must spend many hours and large amounts of money protecting themselves from the current and future negative impacts to their privacy and credit because of the Data Breach.[32]

90. As a direct and proximate result of the Data Breach, Plaintiff and Class members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft. Plaintiff and Class members must now take the time and effort (and spend the money) to mitigate the actual and potential impact of the Data Breach on their everyday lives, including purchasing identity theft and credit monitoring services every year for the rest of their lives, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts, credit reports, and other account information for unauthorized activity for years to come.

---

[32] *Guide for Assisting Identity Theft Victims*, Federal Trade Commission, 4 (Sept. 2013), http://www.global-screeningsolutions.com/Guide-for-Assisting-ID-Theft-Victims.pdf.

91. Plaintiff and Class members have suffered or will suffer actual harms for which they are entitled to compensation, including but not limited to the following:

a. Trespass, damage to, and theft of their personal property, including PII;

b. Improper disclosure of their PII;

c. The imminent and certainly impending injury flowing from actual and potential future fraud and identity theft posed by their PII being in the hands of criminals and having already been misused;

d. The imminent and certainly impending risk of having their confidential PII used against them by spam callers to defraud them;

e. Damages flowing from Defendant's untimely and inadequate notification of the Data Breach;

f. Loss of privacy suffered as a result of the Data Breach;

g. Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the Data Breach;

h. Ascertainable losses in the form of deprivation of the value of Plaintiff's and Class members' PII for which there is a well-established and quantifiable national and international market;

i. The loss of use of and access to their credit, accounts, and/or funds;

j. Damage to their credit due to fraudulent use of their PII; and

k. Increased cost of borrowing, insurance, deposits, and other items which are adversely affected by a reduced credit score.

92. Moreover, Plaintiff and Class members have an interest in ensuring that their PII, which remains in the possession of Defendant, is protected from further public disclosure by the

implementation of better employee training and industry standard and statutorily compliant security measures and safeguards. Defendant has shown to be incapable of protecting Plaintiff's and Class members' PII.

***The Data Breach Was Foreseeable and Preventable***

93. Data disclosures and data breaches are preventable.[33] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[34] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[35]

94. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[36]

95. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[37]

96. Plaintiff and Class members entrusted their PII to Defendant as a condition of receiving mortgage services. Plaintiff and Class members understood and expected that Defendant

---

[33] Lucy L. Thompson, *Despite the Alarming Trends, Data Breaches Are Preventable*, Data Breach and Encryption Handbook (Lucy Thompson, ed., 2012).
[34] *Id.* at 17.
[35] *Id.* at 28.
[36] *Id.*
[37] *See How to Protect Your Networks from RANSOMWARE*, at 3, FBI.gov, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last accessed Jan. 25, 2024).

or anyone in Defendant's position would safeguard their PII against cyberattacks, delete or destroy PII that Defendant was no longer required to maintain, and timely and accurately notify them if their PII was compromised.

***Damages Sustained by Plaintiff and Class Members***

97. To date, Defendant has done nothing to provide Plaintiff and Class members with relief for the damages they have suffered as a result of the Data Breach. Academy only offered "Single Bureau Credit Monitoring/Single Bureau Credit Report/Single Bureau Credit Score" for a mere "twelve (12) months from the date of enrollment,"[38] but did not disclose how it determined eligibility. Not only did Defendant fail to provide adequate ongoing credit monitoring or identity protection services for individuals impacted by the Data Breach, but the credit monitoring identity theft protection services does nothing to compensate Class members for damages incurred and time spent dealing with the Data Breach.

98. Plaintiff and Class members have been damaged by the compromise of their PII in the Data Breach.

99. As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft. Plaintiff and Class members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

100. Plaintiff and Class members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their PII as potential fraudsters could use that information to target such schemes more effectively to Plaintiff and Class members.

---

[38] *See Notice of Data Security Incident*, *supra* note 1.

101. Plaintiff and Class members have and will also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

102. Plaintiff and Class members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a. Reviewing and monitoring financial and other sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

b. Purchasing credit monitoring and identity theft prevention;

c. Placing "freezes" and "alerts" with reporting agencies;

d. Spending time on the phone with or at financial institutions and/or government agencies to dispute unauthorized and fraudulent activity in their names;

e. Contacting financial institutions and closing or modifying financial accounts; and

f. Closely reviewing and monitoring Social Security numbers, insurance accounts, bank accounts, and credit reports for unauthorized activity for years to come.

103. Plaintiff and Class members suffered actual injury from having their PII compromised as a result of the Data Breach including, but not limited to: (a) damage to and diminution in the value of their PII, a form of property that Academy obtained from Plaintiff and Class members; (b) violation of their privacy rights; (c) imminent and impending injury arising from the increased risk of identity theft and fraud; and (d) emotional distress.

104. Further, as a result of Defendant's conduct, Plaintiff and Class members are forced to live with the anxiety that their PII may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy with respect to that information.

105. As a direct and proximate result of Defendant's actions and inactions, Plaintiff and Class members have suffered a loss of privacy and are at a present and imminent and increased risk of future harm.

106. Moreover, Plaintiff and Class members have an interest in ensuring that their PII, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing PII is not accessible online, is properly encrypted, and that access to such data is password protected.

107. Many failures laid the groundwork for the occurrence of the Data Breach, starting with Defendant's failure to incur the costs necessary to implement adequate and reasonable cybersecurity training, procedures and protocols that were necessary to protect Plaintiff's and Class members' PII.

108. Defendant maintained the PII in an objectively reckless manner, making the PII vulnerable to unauthorized disclosure.

109. Defendant knew, or reasonably should have known, of the importance of safeguarding PII and of the foreseeable consequences that would result if Plaintiff's and Class members' PII were stolen, including the significant costs that would be placed on Plaintiff and Class members as a result of the breach.

110. The risk of improper disclosure of Plaintiff's and Class members' PII was a known risk to Defendant, and Defendant was on notice that failing to take necessary steps to secure Plaintiff's and Class members' PII from that risk left the PII in a dangerous condition.

111. Defendant disregarded the rights of Plaintiff and Class members by, *inter alia*, (i) intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that their PII was protected against unauthorized intrusions; (ii) failing to disclose that it did not have adequately robust security protocols and training practices in place to adequately safeguard Plaintiff's and Class members' PII; (iii) failing to take standard and reasonably available steps to prevent the Data Breach; (iv) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (v) failing to provide Plaintiff and Class members prompt and accurate notice of the Data Breach.

## CLASS ALLEGATIONS

112. Plaintiff brings this class action on behalf of herself and all members of the following Class of similarly situated persons pursuant to Federal Rule of Civil Procedure 23:

> **Nationwide Class**
> All persons residing in the United States whose PII was compromised in the Data Breach disclosed by Defendant on or about December 20, 2023, including all who were sent notice of the Data Breach.

113. In the alternative, Plaintiff seeks certification of the following class:

> **Washington Class**
> All persons residing in the state of Washington whose PII was compromised in the Data Breach disclosed by Defendant on or about December 20, 2023, including all who were sent notice of the Data Breach.

114. Excluded from the Class are Defendant and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge(s).

115. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

116. The members in the Class are so numerous that joinder of all Class members in a single proceeding would be impracticable. Academy reported to the Office of the Maine Attorney General that approximately 284,443 individuals' information was exposed in the Data Breach.[39]

117. Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

a. Whether Academy had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII from unauthorized access and disclosure;

b. Whether Academy's computer systems and data security practices used to protect Plaintiff's and Class members' PII violated the FTC Act and/or state laws and/or Academy's other duties discussed herein;

c. Whether Academy failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiff and Class members;

d. Whether Plaintiff and Class members suffered injury as a proximate result of Academy's negligent actions or failures to act;

---

[39] *Notice of Data Security Incident*, *supra* note 1.

e. Whether Academy failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII;

f. Whether an implied contract existed between Class members and Academy providing that Academy would implement and maintain reasonable security measures to protect and secure Class members' PII from unauthorized access and disclosure;

g. Whether injunctive relief is appropriate and, if so, what injunctive relief is necessary to redress the imminent and currently ongoing harm faced by Plaintiff and Class members;

h. Whether Academy's actions and inactions alleged herein constitute gross negligence;

i. Whether Academy breached its duties to protect Plaintiff's and Class members' PII; and

j. Whether Plaintiff and all other members of the Class are entitled to damages and the measure of such damages and relief.

118. Academy engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff on behalf of herself and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

119. Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had her PII compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by Academy, as

described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

120. Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that she has no interests adverse to, or that conflict with, the Class she seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

121. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and all other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Academy, so it would be impracticable for Class members to individually seek redress from Academy's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

122. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

123. Academy owed a duty to Plaintiff and all other Class members to exercise reasonable care in safeguarding and protecting their PII in its possession, custody, or control.

124. Academy knew, or should have known, the risks of collecting and storing Plaintiff's and all other Class members' PII and the importance of maintaining secure systems and using encryption, which it did not use. Academy knew, or should have known, of the many data breaches that targeted corporate entities in recent years.

125. Given the nature of Academy's business, the sensitivity and value of the PII it maintains, and the resources at its disposal, it should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring.

126. Academy breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII entrusted to it—including Plaintiff's and Class members' PII.

127. It was reasonably foreseeable to Academy that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII to unauthorized individuals.

128. But for Academy's negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII would not have been compromised.

129. As a result of Academy's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and all other Class members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and fraud—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation of the value of their PII, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vii) actual or attempted fraud.

**COUNT II**
**NEGLIGENCE PER SE**
**(On Behalf of Plaintiff and the Class)**

130. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

131. Academy's duties arise from, *inter alia*, from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such as Academy, of failing to employ reasonable measures to protect and secure PII.

132. Plaintiff and Class members are within the class of persons that Section 5 of the FTCA was intended to protect.

133. The harm occurring as a result of the Data Breach is the type of harm that Section 5 of the FTCA intended to guard against.

134. It was reasonably foreseeable to Academy that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class members' PII to unauthorized individuals.

135. The injury and harm that Plaintiff and the other class members suffered was the direct and proximate result of Academy's violations of Section 5 of the FTCA. Plaintiff and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and fraud—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation of the value of their PII, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vi) actual or attempted fraud.

## COUNT III
## BREACH OF IMPLIED CONTRACT
## (On Behalf of Plaintiff and the Class)

136. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

137. Academy required Plaintiff and Class members to provide, or authorize the transfer of, their PII in the course of employment or transacting business. In exchange, Academy entered into implied contracts with Plaintiff and Class members in which Academy agreed to comply with

its statutory and common law duties to protect Plaintiff's and Class members' PII and to timely notify them in the event of a data breach.

138. Plaintiff and Class members would not have provided their PII to Academy had they known that Academy would not safeguard their PII as promised, or provide timely notice of a data breach.

139. Plaintiff and Class members fully performed their obligations under their implied contracts with Academy.

140. Academy breached the implied contracts by failing to safeguard Plaintiff's and Class members' PII and by failing to provide them with timely and accurate notice of the Data Breach.

141. The losses and damages Plaintiff and Class members sustained (as described above) were the direct and proximate result of Academy's breach of its implied contracts with Plaintiff and Class members.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

142. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

143. This claim is pleaded in the alternative to the breach of implied contract claim.

144. Plaintiff and Class members conferred a monetary benefit upon Academy in the form of monies paid for mortgage services or other services. In exchange, Plaintiff and Class members should have received from Academy the services that were the subject of the transaction and should have had their PII protected with adequate data security.

145. Academy accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class members. Academy also benefitted from the receipt of Plaintiff's and Class members' PII.

146. Academy knew that Plaintiff and Class members conferred a benefit upon them and accepted and retained that benefit by accepting and retaining the PII entrusted to it. Academy profited from Plaintiff's and Class members' collected and retained data and used Plaintiff's and Class members' PII for business purposes.

147. As a result of Academy's conduct, Plaintiff and Class members suffered actual damages.

148. Academy should not be permitted to retain the money belonging to Plaintiff and Class members because Defendant failed to adequately implement the data privacy and security procedures for itself that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

149. Academy should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

**COUNT V**
**VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT**
**RCW §§ 19.86.010 *et seq.* ("WCPA")**
**(On Behalf of Plaintiff and the Washington Class)**

150. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

151. Plaintiff and Academy are "persons" under the WCPA. RCW § 19.86.010(1).

152. Academy's sale of services to Plaintiff and all other Washington Class members constitutes "trade" or "commerce" under the WCPA. RCW § 19.86.010(2).

153. The WCPA states, "Unfair methods of competition and unfair or deceptive practices in the conduct of any trade or commerce are hereby declared unlawful." RCW § 19.86.020. Academy's failure to adequately safeguard Plaintiff and Class members PII while representing that their PII would be protected is an "unfair or deceptive practice" under the WCPA.

154. Academy's failure to adequately safeguard Plaintiff's and Washington Class members' PII is injurious to the public interest pursuant to RCW § 19.86.093(3)(a) because Academy's actions not only harmed Plaintiff, but harmed hundreds of thousands of other persons.

155. Had Plaintiff and Washington Class members been aware of the omitted and misrepresented facts, i.e., that Academy would not adequately protect their PII, Plaintiff and Washington Class members would not have sought services from Academy.

156. Pursuant to RCW § 19.86.090, Plaintiff seeks actual and treble damages on behalf of herself and all other Washington Class members.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in her favor and against Academy as follows:

A. Certifying the Class as requested herein, designating Plaintiff as Class representative, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of herself and the Class, seeks appropriate

injunctive relief designed to prevent Academy from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft;

D. Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E. Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Awarding Plaintiff and the Class such other favorable relief as allowable under law.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: January 25, 2024

Respectfully submitted,

/s/ James E. Magleby
James E. Magleby (7247)
magleby@mcg.law
Jennifer Fraser Parrish (11207)
parrish@mcg.law
**MAGLEBY CATAXINOS & GREENWOOD, PC**
141 West Pierpont Avenue
Salt Lake City, Utah 84101
Tel.: (801) 359-9000
Fax: (801) 359-9011

Andrew W. Ferich*
aferich@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Tel.: 310.474.9111

Fax: 310.474.8585

Anthony L. Parkhill*
aparkhill@barnowlaw.com
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Ste. 1630
Chicago, IL 60606
Tel.: 312.621.2000
Fax: 312.641.5504

*Attorneys for Plaintiff Celeste Allen*

**pro hac vice* to be submitted